NORTH CAROLINA DEPARTMENT OF CORRECTION v. EARL GIBSON

No. 495A82

(Filed 5 April 1983)

1. **Master and Servant § 7.5; State § 12— employment discrimination—standards to be applied**
    The claimant carries the initial burden of establishing a prima facie case of employment discrimination, and the burden then shifts to the employer to articulate some legitimate nondiscriminatory reason for the claimant's rejection or discharge. If a legitimate nondiscriminatory reason for rejection or discharge has been articulated, the claimant has the opportunity to show that the stated reason for rejection was, in fact, a pretext for discrimination.

2. **Master and Servant § 7.5; State § 12— employment discrimination—prima facie case—burden of producing rebutting evidence**
    Once a prima facie case of employment discrimination is established, the employer has the burden of producing evidence to rebut the presumption of discrimination raised by the prima facie case. The employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons.

---

3. **Master and Servant § 7.5; State § 12— employment discrimination—burden of proof**

In an employment discrimination action, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

4. **Master and Servant § 7.5; State § 12— employment discrimination—rebutting presumption of prima facie case**

To rebut the presumption of employment discrimination raised by a prima facie case, the employer must clearly explain by admissible evidence the nondiscriminatory reasons for the employee's rejection or discharge, and the explanation must be legally sufficient to support a judgment for the employer.

5. **Master and Servant § 7.5; State § 12— employment discrimination—rebuttal of prima facie case—showing reasons are pretext for discrimination**

When the employer explains the nondiscriminatory reasons for challenged employment action, the plaintiff is then given the opportunity to show that the employer's stated reasons are in fact a pretext for intentional discrimination, and plaintiff may rely on evidence offered to establish his prima facie case to carry his burden of proving pretext.

6. **Master and Servant § 7.5; State § 12— employment discrimination—no review of employer's business judgment**

The trier of fact is not at liberty to review the soundness or reasonableness of an employer's business judgment when it considers whether alleged disparate treatment is a pretext for employment discrimination, since the only relevant question, and the sole focus of the inquiry, is the employer's motivation.

7. **Master and Servant § 7.5; State § 12— discharge of black correctional officer—prima facie case of discrimination—rebuttal by employer**

Plaintiff, a black correctional officer at a youthful offender prison, established a prima facie case of employment discrimination because of race by showing that even though he and several white employees failed to make proper checks on 23-24 April 1979 to ensure the presence of two inmates who escaped, only he was discharged. However, defendant employer rebutted the prima facie case by testimony that plaintiff was discharged for his failure to make proper checks throughout his entire shift and his failure to report the condition of the inmates' cell and his inability to arouse them at breakfast before leaving work at the end of his shift, and by testimony that plaintiff's conduct constituted greater negligence than the conduct of the other employees.

8. **Master and Servant § 7.5; State § 12— employment discrimination action—errors by State Personnel Commission**

In an employment discrimination suit brought by a discharged black correctional officer pursuant to G.S. 126-36 and G.S. 143-422.2, the State Personnel Commission erred by placing an improper burden of proof upon defendant employer to show an absence of discrimination, in reviewing the correctness of

defendant employer's business judgment, and in failing to resolve the ultimate question of whether plaintiff was the victim of intentional discrimination.

Justice FRYE did not participate in the consideration or decision of this case.

DEFENDANT appealed pursuant to G.S. 7A-30 from the decision of the Court of Appeals reported at 58 N.C. App. 241, 293 S.E. 2d 664 (1982), *Becton, J.,* with *Hill, J.,* concurring and *Hedrick, J.,* dissenting, reversing the order entered 28 January 1981 in Superior Court, WAKE County, by *Godwin, J.,* which reversed the 29 August 1980 decision of the State Personnel Commission ordering reinstatement of plaintiff to the position from which he was dismissed and awarding net back pay loss and attorney's fees.

Sandhills Youth Center (SYC) is a minimum security prison which houses youthful offenders ages 18 to 21. It does not normally house dangerous inmates. SYC has a segregation area and a nonsegregation area. Inmates reside in the nonsegregation area under less security than any other prison facility in the State. Prisoners are placed there during the last phase of incarceration and given an opportunity to be exposed to a degree of freedom before they are released. They are on their honor to remain at the facility. Conversely, the segregation area is more like a traditional prison and inmates are typically assigned to this area for either administrative or disciplinary segregation.

During the five years preceding the incident in question there had been 119 escapes from the SYC. Eight of these escapes were from the segregation area but the escape involved in this case was only the first or second made from within a segregation cell.

On 24 April 1979, it was discovered that two inmates had escaped from their segregation cell. The inmates, Crumpler and Dunlap, were in segregation for having been found in "an unauthorized area" and they were considered escape risks by SYC supervisors. Crumpler and Dunlap escaped by making a hole in the ceiling of their cell, crawling through a heating duct, entering the attic, and then escaping over the roof of the building. The exact time of their escape remains unknown.

On 23 April 1979, Earl Gibson was a Correctional Program Assistant I (CPA I) and had been so employed for 14 months. He had been recommended for employment by Superintendent F. D. Hubbard. He had made steady progress in his job and was rated a satisfactory employee on two separate evaluations.

Gibson reported for duty in the segregation area at 11:00 p.m. on 23 April 1979. As a CPA I assigned to segregation, Gibson had the responsibility of checking each inmate once each hour throughout the entire shift period. This check involved looking into the cell and seeing "living, breathing flesh." The officer was required to see signs of life before he could count the inmate as present. The purpose for conducting checks was to detect an escape within at least one hour of its occurrence and to insure the mental and physical health of inmates.

When Gibson first looked into the Crumpler-Dunlap cell sometime after 11:00 p.m. on 23 August 1979, he saw that a bed was turned over in the corner with the mattress lying on the floor. It appeared as if a figure was lying on the mattress underneath the blanket. On the other side of the cell, he could see part of another bed in the corner. He could not see who was lying on this bed because it was located in a blind spot.

Gerhard Kunert, the guard who preceded Gibson on the 3:00 p.m. to 11:00 p.m. shift, told Gibson that the cell had been in that condition for a while and that nothing was wrong. At 3:15, one of the inmates told Kunert that the mattress had been taken off the bed because the inmate wanted to sleep on the floor since it was cooler and better for his back. Kunert failed to make a proper check on his last inspection of the cell.

Throughout his shift, Gibson did not notice any change in the condition of the cell. He assumed that Crumpler and Dunlap were asleep in the cell, but did not see "flesh." When Gibson tried to arouse the inmates for breakfast, he received no reply. He then threw a milk carton into the cell but received no response. Gibson departed at the end of his shift without reporting these unusual circumstances to his supervisor.

Carl Smith, a black employee, was the guard who took over Gibson's duty the following shift. He did not check all of the cells at 7:30. Instead he asked another employee, Dennis Deese, to

check the portion of the segregation area housing Dunlap and Crumpler. Deese did not see the inmates and did not report this fact to Smith. On the next hourly check, Smith discovered the escape.

Angus Currie was a CPA I who on 23 April 1979 was the acting shift supervisor in segregation. Part of his duty was to check segregation at least once on his shift to see if all the inmates were present. He failed to make this check.

As a result of this incident, the following disciplinary action was taken: 1. Gibson, a black employee — discharged for his failure to make proper checks during his entire shift and his failure to report a suspicious situation. 2. Kunert, a white employee — oral warning with a follow-up letter for his failure to insure presence on one check. 3. Deese, a white employee — oral warning with a follow-up letter for his failure to insure presence on one check. 4. Carl Smith, a black employee — no discipline. 5. Angus Currie, a white employee and acting shift supervisor on 23 April 1979 — no discipline.

Gibson appealed to the State Personnel Commission asserting that he was discharged because of his race, and prayed for reinstatement to employment, back pay and attorney's fees. The hearing officer found in his favor and recommended the relief prayed for. The full Commission adopted the hearing officer's findings and conclusions and ordered relief as recommended.

Department of Correction (DOC) appealed and Judge Godwin reversed the Commission's order. Gibson appealed to the Court of Appeals. The Court of Appeals reversed the judgment of the Superior Court and DOC appealed to this Court pursuant to G.S. 7A-30(2).

*Rufus L. Edmisten, Attorney General, by Richard L. Kucharski, Assistant Attorney General, for defendant-appellant Department of Correction.*

*Phillip Wright, Lumbee River Legal Services, Inc., for plaintiff-appellee.*

BRANCH, Chief Justice.

Plaintiff instituted this action pursuant to G.S. 126-36, which provides:

Any State employee or former State employee who has reason to believe that employment, promotion, training, or transfer was denied him or that demotion, layoff or termination of employment was forced upon him in retaliation for opposition to alleged discrimination or because of his age, sex, race, color, national origin, religion, creed, political affiliation, or physical disability except where specific age, sex or physical requirements constitute a bona fide occupational qualification necessary to proper and efficient administration, shall have the right to appeal directly to the State Personnel Commission.

The above statute relates only to State employees and is consistent with the legislative policy announced in G.S. 143-422.2 as follows:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

This case is one of first impression in this jurisdiction and we look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.

[1] The United States Supreme Court considered a similar question in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973). There, the claimant had been employed by McDonnell Douglas, but was laid off during a general reduction of the work force. During the period following his layoff, he participated in a stall-in against McDonnell Douglas to protest what he and others believed to be discriminatory practices by the company. His conduct was illegal and unprotected

under the Civil Rights Act. Later, when the company resumed hiring, the claimant made application but was denied employment. He brought an action under Title VII asserting that he was denied employment because he was black and because of his legitimate civil rights activities. McDonnell Douglas maintained that his application was denied because of his involvement in the illegal stall-in. The Court established the following standards to be applied in Title VII cases:

(1) The claimant carries the initial burden of establishing a prima facie case of discrimination.

(2) The burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the applicant's rejection.

(3) If a legitimate nondiscriminatory reason for rejection has been articulated, the claimant has the opportunity to show that the stated reason for rejection was, in fact, a pretext for discrimination. The evidentiary standard set forth in *McDonnell Douglas* has also been applied to cases in which an employee has been discharged. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed. 2d 493 (1976).

The burden of establishing a prima facie case of discrimination is not onerous. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed. 2d 207 (1981). It may be established in various ways. For example, a prima facie case of discrimination may be made out by showing that (1) a claimant is a member of a minority group, (2) he was qualified for the position, (3) he was discharged, and (4) the employer replaced him with a person who was not a member of a minority group. *Coleman v. Braniff Airways, Inc.*, 664 F. 2d 1282 (5th Cir. 1982); *Marks v. Prattco, Inc.*, 607 F. 2d 1153 (5th Cir. 1979).

A prima facie case of discrimination may also be made out by showing the discharge of a black employee and the retention of a white employee under apparently similar circumstances. *Turner v. Texas Instruments, Inc.*, 555 F. 2d 1251 (5th Cir. 1977); *Brown v. A. J. Gerrard Mfg. Co.*, 643 F. 2d 273 (5th Cir. 1981). *See also McDonald v. Santa Fe Trail Transp. Co.*, *supra* (white employees were discharged while black employees were retained under similar circumstances).

When a prima facie case is established, a presumption arises that the employer unlawfully discriminated against the employee. *Texas Dept. of Community Affairs v. Burdine, supra.* The showing of a prima facie case is not equivalent to a finding of discrimination. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed. 2d 957 (1978). Rather, it is proof of actions taken by the employer from which a court may infer discriminatory intent or design because experience has proven that in the absence of an explanation, it is more likely than not that the employer's actions were based upon discriminatory considerations. *Id.*

[2] Once a prima facie case of discrimination is established, the employer has the burden of *producing* evidence to rebut the presumption of discrimination raised by the prima facie case. *McDonnell Douglas Corp. v. Green, supra; Texas Dept. of Community Affairs v. Burdine, supra.* Some of the earlier federal cases held that the employer had the burden of proving by a preponderance of the evidence his legitimate nondiscriminatory reasons for his actions. *Whiteside v. Gill,* 580 F. 2d 134 (5th Cir. 1978); *Silberhorn v. General Iron Works Co.,* 584 F. 2d 970 (10th Cir. 1978); *Turner v. Texas Instruments, Inc., supra.* The United States Supreme Court settled this question, however, in *Texas Dept. of Community Affairs v. Burdine, supra.* In that case the Court held that after a plaintiff proves a prima facie case of discrimination, the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons. The employer is not required to prove that its action was actually motivated by the proffered reasons for it is sufficient if the evidence raises a genuine issue of fact as to whether the claimant is a victim of intentional discrimination. *Id.*

[3] It is thus clear that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed. 2d at 215. We are of the opinion that footnote 8 in *Texas Dept. of Community Affairs v. Burdine* clearly states the rationale of this holding. We quote:

This evidentiary relationship between the presumption created by a prima facie case and the consequential burden of

production placed on the defendant is a traditional feature of the common law. "The word 'presumption' properly used refers only to a device for allocating the production burden." F. James & G. Hazard, Civil Procedure § 7.9, p. 255 (2d ed. 1977)(footnote omitted). See Fed. Rule Evid. 301. See generally 9 J. Wigmore, Evidence § 2491 (3d ed. 1940). Cf. J. Maguire, Evidence, Common Sense and Common Law 185-186 (1947). Usually, assessing the burden of production helps the judge determine whether the litigants have created an issue of fact to be decided by the jury. In a Title VII case, the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.

*Id.* at 255, 101 S.Ct. at 1094, 67 L.Ed. 2d at 216 n. 8.

[4] To rebut the presumption of discrimination, the employer must clearly explain by admissible evidence, the nondiscriminatory reasons for the employee's rejection or discharge. *Id.* The explanation must be legally sufficient to support a judgment for the employer. *Id.* If the employer is able to meet this requirement, the prima facie case, and the attendant presumption giving rise thereto, is successfully rebutted. *Id.*

[5] When the employer explains the nondiscriminatory reasons for his action, the plaintiff is then given the opportunity to show that the employer's stated reasons are in fact a pretext for intentional discrimination. We note parenthetically that the plaintiff may rely on evidence offered to establish his prima facie case to carry his burden of proving pretext. *Texas Dept. of Community Affairs v. Burdine, supra.*

We believe it helpful to note some of the factors which courts have considered as relevant evidence of pretext. They are:

(1) Evidence that white employees involved in acts against the employer of comparable seriousness were retained or rehired,

(2) Evidence of the employer's treatment of the employee during his term of employment,

(3) Evidence of the employer's response to the employee's legitimate civil rights activities, and

(4) Evidence of the employer's general policy and practice with respect to minority employees.

*See McDonnell Douglas Corp. v. Green, supra.*

**[6]**  The trier of fact is not at liberty to review the soundness or reasonableness of an employer's business judgment when it considers whether alleged disparate treatment is a pretext for discrimination.

In *Loeb v. Textron,* 600 F. 2d 1003 (1st Cir. 1979), the Court stated:

> While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act upon or approve . . . . An employer is entitled to make his own policy and business judgment. . . .
>
> \* \* \*
>
> The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one. The jury must understand that its focus is to be on the employer's motivation, however, and not on its business judgment.

*Id.* at 1012, n. 6. (Citations omitted.) *See also Olsen v. Southern Pacific Transp. Co.,* 480 F. Supp. 773 (N.D. Cal. 1979), *aff'd sub nom. Willey v. Southern Pacific Transp. Co.,* 654 F. 2d 733 (9th Cir. 1981).

In determining what discipline is appropriate in a given case an employer has the discretion to consider all the facts and make a determination of whether an employee's conduct warrants discharge or a milder form of punishment. *Osborne v. Cleland,* 620 F. 2d 195 (8th Cir. 1980).

In *Turner v. Texas Instruments, Inc.,*[1] *supra,* the employer investigated alleged time card violations by two of its employees. Turner, a black employee, was discharged because the company believed that he had knowingly violated a company rule by allowing another employee to punch his (Turner's) time card. Burns, a white employee, was not discharged because the company found that he had not knowingly violated the rule. Turner filed a Title VII action in federal district court. The court held that Turner had not approved the punching of his time card and entered judgment for him.

The Fifth Circuit reversed, pointing out that the trial court erroneously identified the controlling question as being whether Texas Instruments was wrong in its belief that Turner was guilty of knowing time card violations and Burns was not. The proper question was whether Texas Instruments sincerely held this belief. The Court stated, "[e]ven if TI wrongly believed that Turner knowingly violated this policy, if TI acted on this belief it was not guilty of racial discrimination." *Id.* at 1256. *See also Wright v. Western Electric Co.,* 664 F. 2d 959 (5th Cir. 1981). Thus, it is clear that it is not important that the trier of fact believes the employer's judgment or course of action to be erroneous or even unreasonable as the *only* relevant question, and the *sole* focus of the inquiry, is the employer's motivation.

The ultimate purpose of G.S. 126-36, G.S. 143-422.2, and Title VII (42 U.S.C. 2000(e), *et seq.*) is the same; that is, the elimination of discriminatory practices in employment. We find the principles of law and the standards above set forth as applied to Title VII are sound and properly focus the inquiry upon the ultimate issue of whether the employee was the victim of *intentional* discrimination. We therefore adopt the evidentiary standards and principles of law above set forth insofar as they are not in conflict with our statutes and case law.

---

1. *Turner v. Texas Instruments, Inc., supra,* is one of the cases decided before *Texas Dept. of Community Affairs v. Burdine, supra,* holding that employers had to prove by the preponderance of the evidence that an applicant was rejected or an employee discharged for the articulated reasons and not for race, sex, or some other unlawful consideration. While this part of *Turner* has been overruled by *Burdine,* other parts of the opinion are unaffected by the Supreme Court's decision.

[7] In the case before us the Commission found, and we think correctly so, that Gibson established a prima facie case of discrimination by showing that even though he and several white employees failed to make proper checks to insure the presence of Dunlap and Crumpler on 23-24 April 1979, only he was discharged.

We also agree with the Commission's conclusion that DOC rebutted the prima facie case by clearly articulating legitimate nondiscriminatory reasons for plaintiff's discharge. Superintendent F. D. Hubbard testified that Gibson was discharged for his failure to make proper checks throughout his entire shift and his failure to report an obviously suspicious situation (the condition of the cell and his inability to arouse the inmates at breakfast) before leaving work at the end of his shift. He testified that plaintiff's conduct constituted greater negligence than the conduct of Currie, Kunert and Deese. This explanation was sufficient to raise a genuine issue of fact as to whether DOC intentionally discriminated against plaintiff.

Plaintiff then attempted to prove that the reasons given for his discharge were a pretext for discrimination by showing that DOC had not discharged a white employee, O'Neal, for what plaintiff contended were acts of comparable seriousness. Angus Currie testified that several months before Dunlap and Crumpler escaped, he and O'Neal were on duty in a nonsegregation area. On that night, O'Neal was working in the supervisor's office totaling the merits and demerits inmates had received in the dormitory, kitchen and at work. During this time O'Neal was also responsible for insuring the presence of inmates in two cell areas. He failed to do so on three or four occasions. Toward the end of his shift, he discovered that an inmate was missing. O'Neal was reprimanded by the Department for his conduct.

Mr. Hubbard, who recommended plaintiff's dismissal, testified that he considered plaintiff's "transgressions" to be more serious than O'Neal's. He pointed out that the area O'Neal was working in was a minimum security area while plaintiff was working in a segregation area where security was especially emphasized. He also pointed out that O'Neal, after having failed to insure presence on three or four checks, discovered the escape when an inmate failed to respond to O'Neal's attempts to awaken

him. Plaintiff, on the other hand, made improper checks on eight occasions. When he was unable to arouse Dunlap and Crumpler by calling their names, he threw a milk carton at one of the beds, still evoking no response. Shortly thereafter, plaintiff left work at the end of his shift without reporting this situation. His failure to report the suspicious situation was the most influential factor in Hubbard's decision to recommend plaintiff's discharge.

In addition to distinguishing the conduct of O'Neal and plaintiff, DOC attempted to show that plaintiff was not discharged on account of his race by showing the absence of the other factors the United States Supreme Court held to be relevant to the question of pretext in *McDonnell Douglas Corp. v. Green, supra.* DOC showed that plaintiff was treated well during his term of employment. F. D. Hubbard, who recommended plaintiff's discharge, had initially written a letter recommending plaintiff for employment as he then considered plaintiff to be an excellent candidate. DOC also showed that after his training, plaintiff was making steady progress in his job performance, having been rated a satisfactory employee in two separate evaluations.

DOC filed documentary exhibits which showed that at the time of plaintiff's discharge over 40% of the work force at SYC were black employees. There were one black and four white employees at the level CPA II, and 11 white and 14 black employees at the level CPA I. There was no evidence presented to show that plaintiff was involved in or discharged for his legitimate civil rights activities.

The hearing officer, after hearing the evidence, found facts and entered, *inter alia,* the following relevant conclusions of law:

4. It is now incumbent upon Petitioner to show that the reasons elicited by Respondent for imposing a harsher disciplinary punishment upon him were a pretext for racial discrimination. Mr. Gibson has shown that Mr. O'Neal, a white correctional officer, failed to make a proper check (see living, breathing flesh) on several rounds during a night shift which resulted in an escape by an inmate from a non-segregation area and that Respondent only reprimanded Mr. O'Neal for this offense. It is essential that we examine the distinction Respondent makes between the escapes in which Mr. Gibson and Mr. O'Neal were involved. Respondent

asserts vigorously that Petitioner was not dismissed due to the escape by the inmates but rather for not making a proper check during his entire shift and for failing to investigate further after he threw a milk carton into the cell and received no response. The Department contended that the key distinction between Petitioner's and Mr. O'Neal's situations was that Mr. O'Neal recognized the escape and Petitioner did not. It must be noted that in both cases (Petitioner's and Mr. O'Neal's) the Department had just cause to dismiss the employees involved. Yet, Respondent chose to retain Mr. O'Neal and dismiss Petitioner. It is difficult to rationalize or comprehend the justification for retaining an employee who missed several checks and was presumably responsible for an escape simply because he later discovered the escape. I find the distinction illusory. On one hand, the inmates under Petitioner's supervision in the segregation unit were housed in the most secure area of the Center and it was generally understood by the employees of the Center that an inmate could escape the segregation area only through the barred window or through the door. After seeing no change in the room and no way an inmate could effect an escape, it is readily discernible why Mr. Gibson had a lackadaisical attitude about conducting a proper check (seeing living, breathing flesh). It is understandable how an employee could overrely on the supposedly "escape proof nature" of the segregation area, but not necessarily excusable. On the other hand, inmates readily effected escapes from the non-segregation area where Mr. O'Neal supervised and employees knew that the area was not as secure as the segregation unit. It is not so easily understandable how an employee could fail to conduct proper checks in an area of the Center where he knew inmates could readily effect an escape. An officer who has failed to conduct several proper checks in such a situation is more apt to suspect that an escape has occurred.

5. When just cause exists to terminate an employee and absent some compelling justification for his retention, the employee should be dismissed. Yet, no compelling justification can be raised for the instant aberration (Mr. O'Neal's retention). It is reasonable for a member of a minority group to feel that he has been discriminated on the basis of his

membership in the group when he and a fellow employee not of his group commit substantially similar offenses and his (the minority's) disciplinary action is substantially harsher than his fellow employee's. Likewise, the Commission can reasonably conclude, that in the absence of some compelling justification for the difference in treatment of the two employees, the Respondent discriminated against the Petitioner due to his race.

6. Without an admission that prohibited discrimination has occurred, one may never be certain that it was or was not a factor in a particular decision. Proof of discrimination often must be gleaned from the bits and pieces of evidence which indicate a probability that discrimination has occurred. As a practical matter, discriminatory acts may not be recognized as such by those who commit them. Respondent has shown that it had just cause to dismiss Petitioner, but the treatment accorded Petitioner as opposed to a similarly situated white employee was unequal. Therefore, the inference that Petitioner was dismissed due to his race must be sustained.

The hearing officer thereupon entered judgment in favor of Gibson. The full Commission adopted the findings of fact and "Conclusions of Law" of the hearing officer as its own. The Commission ordered DOC to reinstate plaintiff to his former position or a similar one, to reimburse plaintiff for his net back pay loss, to pay plaintiff's attorney's fees and to consider plaintiff's letter of dismissal as a final warning.

The cause came on to be heard before Judge Godwin on DOC's appeal who reversed the Commission's order on the grounds that the Commission failed to consider a substantial amount of evidence tending to show an absence of discrimination on the part of DOC, that the order was arbitrary and capricious, that the order was not supported by substantial evidence, that the order was affected by error of law and made upon unlawful procedure, and that the order constituted the Commission's

substitution of its business judgment for that of DOC in violation of G.S. 150A-51.[2]

The Court of Appeals reversed *in toto.*

[8]　DOC contends that the Court of Appeals erroneously held that the Commission properly applied the Title VII evidentiary standards. DOC's position is that the Commission's order was made upon unlawful procedure and affected by error of law in violation of G.S. 150A-51(3)and (4).

We first consider DOC's contention that the Commission erroneously placed a burden of proof on DOC in conclusion No. 5 where it stated, "the Commission can reasonably conclude that in the absence of some *compelling justification* for the difference in treatment of the two employees, the Respondent discriminated against the Petitioner due to his race." (Emphasis added.)

We reiterate that *Texas Dept. of Community Affairs v. Burdine, supra,* makes it clear that the only burden placed upon the employer is a burden of producing evidence to rebut the plaintiff's prima facie case. We find nothing in the case law or statutory law which purports to place a burden of proof upon the employer. The above-quoted language clearly imposes a stringent burden of proof upon DOC to prove the absence of discriminatory

---

2. G.S. 150A-51 provides:

Scope of review, power of court in disposing of case.—The Court may affirm the decision of the agency or remand the case for further proceeding; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or

(6) Arbitrary or capricious.

If the court reverses or modifies the decision of the agency, the judge shall set out in writing, which writing shall become a part of the record, the reasons for such reversal or modification.

purpose. We therefore hold that the Court of Appeals erred in deciding that no burden had been erroneously placed on defendant.

A cursory examination of conclusion No. 4 discloses that the Commission exceeded the bounds of its authority by deciding that DOC was incorrect in its determination that security should be a greater concern in segregated areas than in nonsegregated areas. Further, the Commission improperly concluded that DOC incorrectly considered O'Neal's discovery of escape as a fact in mitigation of his transgressions. These matters related to the soundness of the employer's business judgment and the trier of fact may not be concerned with whether this judgment was unreasonable or even erroneous. *See Loeb v. Textron, supra.* The sole question for the trier of fact in the context of this case is whether defendant DOC was racially motivated in its discharge of plaintiff. The Commission failed to conclude that DOC did not honestly believe that the two instances of deviant conduct were distinguishable and warranted different disciplinary action.

Finally, the Commission completely failed to resolve the ultimate question involved in this appeal. This record does not disclose that the Commission found or concluded that plaintiff was the victim of *intentional* discrimination. Indeed the language in conclusion No. 6 that "[a]s a practical matter discriminatory acts may not be recognized as such by those who commit them" reveals that the Commission acted under a misapprehension of the law. This statement flies in the face of the holdings in *Turner v. Texas Instruments, supra,* and *Wright v. Western Electric Co., supra.* Further, it defies reason to say that a person could have the animus or motivation to *intentionally* practice discrimination upon a person because of his race without being aware of such animus or motivation.

Accordingly, the Court of Appeals erred by holding that the Commission's order was not made upon unlawful procedure or affected by error of law.

In light of the present condition of this record, we elect not to consider the question of whether there was substantial evidence to support the Commission's conclusions of law and its resulting order.

In summary, we hold that the Commission erred by placing an improper burden of proof upon defendant to show an absence of discrimination, by reviewing the correctness of defendant's business judgment and in failing to resolve the ultimate question of whether plaintiff was the victim of *intentional* discrimination. These errors require remand to the State Personnel Commission for a new hearing consistent with this opinion.

The decision of the Court of Appeals is reversed and this cause is remanded to that Court with direction that it be returned to the Superior Court for remand to the Personnel Commission for further proceedings consistent with this opinion.

Reversed and remanded.

Justice FRYE did not participate in the consideration or decision of this case.