DAVIS, Judge.
*547 Patricia L. Head ("Plaintiff") appeals from the trial court's order granting summary judgment in favor of Adams Farm Living, Inc. ("Defendant") on her claim that she was wrongfully discharged in violation of North Carolina public policy due to her religious beliefs. After careful review, we affirm.
Factual Background
Defendant operates a skilled nursing and healthcare facility ("the Facility") in Jamestown, North Carolina. Plaintiff served as the Activities Director for the Facility from 13 November 2006 until her discharge on 10 December 2012. In performing her role as Activities Director, Plaintiff regularly came into contact-and interacted-with residents of the Facility, the majority of whom were elderly.
Plaintiff is a Seventh-Day Adventist. As a member of this religious denomination, she adheres to many of the Levitical dietary laws and consequently cannot "receiv[e] any organic material derived from pigs" into her body. However, she can consume eggs.
In November 2012, the Facility experienced a flu outbreak. In response to the outbreak, the Guilford County Health Department recommended to Patti Anderson ("Anderson"), the Facility's Administrator, and Dr. Michael Robson ("Dr. Robson"), its Medical Director, that the Facility's employees and contractors receive the flu vaccine. On 2 December 2012, Anderson posted a notice mandating that all of the Facility's employees receive a flu shot. The notice stated, in pertinent part, as follows:
*548 All Staff
INFLUENZA VACCINATION
The vaccine is for your protection, the protection of your family and community AND the protection of our resident family. The flu has already resulted in two deaths in Forsyth County. Let's all work together to protect our community.
MANDATORY VACCINATION
• All Adams Farm staff and contractors are required to have the flu vaccine no later than 11:59 p.m. Wednesday, December 5, 2012.
• Declining is not an option. This is a dead virus and the only standard reason for not receiving [sic] is an allergy to eggs.
• THEREFORE, to not receive the vaccine would require a physician statement dated between today and Wednesday December 5, 2012, stating the specific medical justification.
• Failure to receive the vaccination or provide the required documentation will result in being taken off the work schedule.
*907 On 3 December 2012, Plaintiff obtained a letter from Dr. W.P. Hollar ("Dr. Hollar"), a chiropractor (who is also Plaintiff's father), asking that she be exempted from the vaccine requirement. The letter stated, in pertinent part, as follows:
To Whom it May Concern:
I am respectfully submitting this document to help you understand why [Plaintiff] is respectfully declining to take the flu shot at your skilled nursing facility. She has told me that you have made it mandatory to all your employees. That is why she has ask [sic] for my guidance in this matter.
It is my opinion that, because in [Plaintiff's] childhood she suffered from a [sic] autoimmune disease that debilitated her, so much that she was taken out of school for several months and has had several exacerbations in her adult life *549 as well. I don't want her to take the risk and [sic] her fear of compromising her immune system. [Plaintiff] will be willing to wear a face mask if necessary I am sure. If I may be of any further help in this matter, please let me know.
Thank you in advance for your understanding in this matter and your inconvenience.
Plaintiff submitted Dr. Hollar's letter to Anderson during a meeting between the two of them on or about 4 December 2012 in which Plaintiff explained that she "did not want to take the vaccine, and if it had swine stuff in it, no, I did not [want to take the vaccine], because of my religion." During the meeting, Plaintiff also provided Anderson with an Internet article titled "Pastor: Vaccines Are Not Kosher." The article stated, in part, that "[i]f you stay clear of pork and shellfish, as the Bible instructs, you need to know flu vaccines include: animal tissues and fluids forbidden in the Bible ... Vaccines include horse blood, rabbit brain, dog kidney, monkey kidney, pig blood, and porcine (pig) protein/tissue among other things...." In response, Anderson "pointed out [to Plaintiff] that the flu shot we were asking her to take was egg based and that the vaccine was not for the swine flu. [Plaintiff] agreed she was not allergic to eggs and admitted she ate eggs."
Anderson informed Plaintiff that she would consider Plaintiff's request to be exempted from the vaccine policy along with the letter and article Plaintiff had provided. Anderson then consulted with Dr. Robson regarding Plaintiff's request. Dr. Robson told Anderson that Plaintiff's childhood illness "actually made it even more important for her own health that she receive a flu shot." Dr. Robson also offered to meet with Plaintiff, telling Anderson that Plaintiff could "[c]ome and talk to me anytime" about her concerns with taking the flu shot.
On 6 December 2012, Anderson had another meeting with Plaintiff. At this meeting, Plaintiff was informed that Anderson could not accept Dr. Hollar's letter as she did not consider it to be a "physician statement" as required by the vaccine notice. Anderson further informed Plaintiff that based on her own research she had learned that the Seventh-Day Adventist Church-doctrinally-takes no position on the propriety of receiving flu shots.
Plaintiff reiterated her refusal to take the flu shot, stating-among other things-that "[she] didn't want to take the flu shot based upon [her] views of [her] own health" and that her "dietary concerns ... w[ere] personal to [her]." Anderson informed Plaintiff of Dr. Robson's *550 offer to meet with her, but Plaintiff declined the offer. Anderson also told Plaintiff she could have additional time to obtain a letter from a physician providing a medical justification for her refusal to be vaccinated.
On 7 December 2012, Anderson called Plaintiff at her home "in another and final attempt to assure that [Plaintiff] had sufficient opportunity to consider her decision and seek medical doctor input[.]" Anderson then "reviewed for a final time [Plaintiff's] position as [she] understood it."
Four days later, Plaintiff called and spoke with Anderson again. Plaintiff informed Anderson that she would not agree to take the flu shot. Anderson then terminated her employment with Defendant.
*908 Three other employees of Defendant provided medical notes stating that they could not take the flu shot because they were either allergic to eggs or had experienced an adverse reaction to a flu vaccination in the past. Based on these notes, these employees were excused from the vaccine requirement. One other employee resigned rather than be vaccinated.
On 28 January 2013-over a month after her discharge-Plaintiff obtained a letter from Dr. Stephen Leighton ("Dr. Leighton"), a licensed physician, stating that he had advised Plaintiff not to take the flu shot because receiving the vaccination could result in a recurrence of the autoimmune disease she experienced as a child. Plaintiff did not provide this letter to Anderson. Nor did she make any request that Defendant reinstate her to her former job.
On 30 October 2013, Plaintiff filed a complaint in Guilford County Superior Court asserting claims against Defendant for wrongful discharge in violation of North Carolina public policy. In her complaint, she alleged that her discharge violated North Carolina's public policies against religious discrimination and interference with the physician-patient relationship. On 30 December 2013, Defendant filed an answer to the complaint.
On 16 July 2014, Defendant filed a motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. In support of its motion, Defendant submitted an affidavit from Anderson, the depositions of Plaintiff and Dr. Robson, and a number of exhibits. Defendant filed an amended motion for summary judgment on 15 August 2014 for the purpose of supplementing the record with an additional affidavit from Anderson. In response to Defendant's motion, Plaintiff submitted her own affidavit.
*551 A hearing on Defendant's amended motion for summary judgment was held before the Honorable R. Stuart Albright on 2 September 2014. On 5 September 2014, Judge Albright entered an order granting summary judgment in favor of Defendant. Plaintiff filed a timely notice of appeal to this Court.
Analysis
Plaintiff's sole argument on appeal is that the trial court erred in granting Defendant's motion for summary judgment. She contends that because (1) Defendant failed to provide a reasonable accommodation for her religious beliefs; and (2) she produced sufficient evidence to create a jury question under a disparate treatment theory as to whether her discharge resulted from religious discrimination, the trial court's order should be vacated and the case remanded for trial.[1]
"On an appeal from an order granting summary judgment, this Court reviews the trial court's decision de novo. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Premier, Inc. v. Peterson, --- N.C.App. ----, ----, 755 S.E.2d 56, 59 (2014) (internal citations and quotation marks omitted). "The moving party has the burden of demonstrating the lack of any triable issue of fact and entitlement to judgment as a matter of law. The evidence produced by the parties is viewed in the light most favorable to the non-moving party." Hardin v. KCS Int'l, Inc., 199 N.C.App. 687, 695, 682 S.E.2d 726, 733 (2009) (internal citations omitted). We have held that "[a]n issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." In re Alessandrini, --- N.C.App. ----, ----, 769 S.E.2d 214, 216 (2015) (citation omitted).
*909 I. Wrongful Discharge in Violation of Public Policy
It is well settled that "[i]n North Carolina, absent an employment contract for a definite period of time, both employer and employee are *552 generally free to terminate their association at any time and without reason. An exception to the employment-at-will doctrine exists when an employee is discharged in contravention of public policy." Simmons v. Chemol Corp., 137 N.C.App. 319, 321-22, 528 S.E.2d 368, 370 (2000) (internal citations and quotation marks omitted).
In order to state such a claim, "an employee must plead and prove that the employee's dismissal occurred for a reason that violates public policy." Brackett v. SGL Carbon Corp., 158 N.C.App. 252, 259, 580 S.E.2d 757, 761-62 (2003) (citation, quotation marks, and alterations omitted). Furthermore, "[t]he public policy exception to the at-will employment doctrine is confined to the express statements contained within our General Statutes or our Constitution." Whitings v. Wolfson Casing Corp., 173 N.C.App. 218, 222, 618 S.E.2d 750, 753 (2005).
In her appeal, Plaintiff asserts that her discharge violated North Carolina's public policy against religious discrimination as articulated by our General Assembly in N.C. Gen.Stat. § 143-422.2, which states, in pertinent part, that
[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.
N.C. Gen.Stat. § 143-422.2 (2013).
A. Duty to Accommodate
Plaintiff contends that Defendant had a legal duty to reasonably accommodate her religious beliefs and failed to do so. In making this argument, Plaintiff asserts that because a duty of reasonable accommodation exists under Title VII of the Civil Rights Act of 1964, such a requirement should likewise be read into N.C. Gen.Stat. § 143-422.2.
Plaintiff is correct that employers generally have a duty-subject to certain exceptions-to reasonably accommodate the religious beliefs of their employees under Title VII. 42 U.S.C. § 2000e-2 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer ... to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion[.]" 42 U.S.C. § 2000e-2(a)(1) (2013). This statutory provision operates in conjunction with 42 U.S.C. § 2000e(j), which states, in part, *553 that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (2013).
However, we have previously held that N.C. Gen.Stat. § 143-422.2 does not impose a corresponding duty of reasonable accommodation by an employer. In Simmons, the plaintiff-employee, a welder, brought a wrongful discharge claim against his former employer alleging that he was terminated in violation of North Carolina public policy as articulated in N.C. Gen.Stat. § 143-422.2 due to a respiratory condition that rendered him disabled and unable to perform his job duties. Simmons, 137 N.C.App. at 319-20, 528 S.E.2d at 369. The defendant moved for summary judgment, asserting that the plaintiff was discharged not because of his medical condition but rather because of his poor job performance. Id. at 320-21, 528 S.E.2d at 369. The plaintiff contended that any deficiencies in his job performance were the result of the defendant's failure to make reasonable accommodations for his respiratory condition by, for example, providing him with breathing masks, ceiling fans, and other breathing aids that would have allowed him to perform his job duties despite his disability. Id. at 320, 528 S.E.2d at 369. He argued that the defendant's failure to reasonably *910 accommodate his disability violated N.C. Gen.Stat. § 143-422.2. Id.
On appeal, we affirmed the trial court's entry of summary judgment in favor of the defendant. In rejecting the plaintiff's reasonable accommodation argument, we held that
plaintiff's concern with the defendant's alleged failure to provide reasonable accommodations to the plaintiff is misplaced. Had plaintiff filed a claim under N.C. Gen.Stat. § 168A-11, which provides a civil cause of action under the NCHPPA, such a discussion may have been appropriate. However, since plaintiff's claim is based on wrongful discharge in violation of public policy under N.C. Gen.Stat. § 143-422.2, a discussion of reasonable accommodations ... is irrelevant.
Id. at 323, 528 S.E.2d at 371.
Therefore, Simmons establishes that no duty of reasonable accommodation exists under N.C. Gen.Stat. § 143-422.2. While Simmons concerned a claim of discrimination based on disability rather than religion, this distinction is irrelevant given that the articulation of public policy *554 set out in N.C. Gen.Stat. § 143-422.2 prohibits discrimination in employment based on both disability and religion. Plaintiff's argument on this issue is therefore overruled.
B. Disparate Treatment
Plaintiff next argues that even if no duty of reasonable accommodation existed, the trial court nevertheless erred in granting Defendant's motion for summary judgment based on a disparate treatment theory. In analyzing Plaintiff's allegations of disparate treatment, we apply the analytical framework articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
The Supreme Court of the United States in McDonnell Douglas established evidentiary standards to be applied governing the disposition of an action challenging employment discrimination. First, the claimant carries the initial burden of establishing a prima facie case of discrimination. The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. If a legitimate, nondiscriminatory reason has been articulated, the claimant has the opportunity to show that the employer's stated reason for the claimant's rejection was in fact pretext.
The North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under § 143-422.2 insofar as they do not conflict with North Carolina statutes and case law.
Johnson v. Crossroads Ford, Inc., --- N.C.App. ----, ----, 749 S.E.2d 102, 107-08, disc. review denied, 367 N.C. 283, 752 S.E.2d 471 (2013) (internal citations, quotation marks, and brackets omitted).
In applying this test, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the employee." Id. at ----, 749 S.E.2d at 108 (citation, quotation marks, and brackets omitted). Therefore, we must apply the McDonnell Douglas test in reviewing the trial court's entry of summary judgment for Defendant.
1. Prima Facie Case
Our Supreme Court has observed that "[t]he burden of establishing a prima facie case of discrimination is not onerous. It may be established *555 in various ways." N.C. Dep't of Correction v. Gibson, 308 N.C. 131, 137, 301 S.E.2d 78, 82 (1983) (internal citation omitted).
In Johnson, we held that "[i]n order to establish a prima facie case of disparate treatment pursuant to N.C.G.S. § 143-422.2, plaintiff must show by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." Johnson, --- N.C.App. at ----, 749 S.E.2d at 108 (citation and brackets omitted).
*911 When a prima facie case is established, a presumption arises that the employer unlawfully discriminated against the employee. The showing of a prima facie case is not equivalent to a finding of discrimination. Rather, it is proof of actions taken by the employer from which a court may infer discriminatory intent or design because experience has proven that in the absence of an explanation, it is more likely than not that the employer's actions were based upon discriminatory considerations.
Gibson, 308 N.C. at 138, 301 S.E.2d at 83 (internal citations omitted).
As a Seventh-Day Adventist, Plaintiff was a member of a protected class. See Vanderburg v. N.C. Dep't of Revenue, 168 N.C.App. 598, 609-11, 608 S.E.2d 831, 839-40 (2005) (recognizing religious affiliation as constituting membership in protected class in employment discrimination context). Furthermore, she contends-and Defendant does not dispute-that she was qualified for her position and was satisfactorily performing her job duties. Finally, she was terminated for her refusal to take the flu vaccine while three other employees who were not Seventh-Day Adventists were allowed to keep their jobs despite not taking the vaccine.
Therefore, Plaintiff has made out a prima facie case of religious discrimination. See Vanderburg, 168 N.C.App. at 610-11, 608 S.E.2d at 840 (where plaintiff "offered substantial evidence showing his dismissal was not based on his alleged unacceptable job performance" and that termination was allegedly based, in part, on his religious expression and practices, "evidence was sufficient to show a prima facie case of discrimination ... based on his religious practices").
*556 2. Legitimate Nondiscriminatory Reason
It is well settled that
[o]nce a prima facie case of discrimination is established, the employer has the burden of producing evidence to rebut the presumption of discrimination raised by the prima facie case.... The employer is not required to prove that its action was actually motivated by the proffered reasons for it is sufficient if the evidence raises a genuine issue of fact as to whether the claimant is a victim of intentional discrimination.
Gibson, 308 N.C. at 138, 301 S.E.2d at 83 (emphasis omitted).
"To rebut the presumption of discrimination, the employer must clearly explain by admissible evidence, the nondiscriminatory reasons for the employee's rejection or discharge. The explanation must be legally sufficient to support a judgment for the employer. If the employer is able to meet this requirement, the prima facie case, and the attendant presumption giving rise thereto, is successfully rebutted." Id. at 139, 301 S.E.2d at 84 (internal citations omitted).
In the present case, Defendant has clearly established a nondiscriminatory reason for Plaintiff's discharge. In her affidavit, Anderson discussed the circumstances giving rise to the Facility's requirement that its employees receive the flu vaccination.
4. In late November 2012, we had a flu "outbreak" at our facility as defined by the Center for Disease Control ("CDC"). Our residents are highly vulnerable to respiratory illnesses due to their age and/or multiple and complex comorbidities. These comorbidities, when combined with acute respiratory illness, can cause our residents to suffer serious medical complications and can even lead to death.
5. To protect residents from the serious health dangers associated with a flu outbreak, the CDC, through its published bulletins, and the Guilford County Health Department, through its direct communications with both me and our Medical Director, strongly recommended that a flu shot be required for employees and contractors working at healthcare facilities who come in contact with residents.
....
*557 22. As a result of the flu outbreak in November-December 2012, 31 residents (36% of all residents) were diagnosed with upper respiratory infection (probable flu), 4 residents were hospitalized, and, based on the Medical Director's review, 3 residents died for reasons related to the outbreak. It was only after it was determined that our facility had a verified influenza *912 outbreak per CDC guidelines that the decision to require employee vaccination was made and the mandatory vaccination policy was implemented.
Anderson's affidavit further related the entire sequence of events leading up to Plaintiff's discharge, including Anderson's efforts to resolve the issues raised by Plaintiff's refusal to take the vaccine. Anderson testified that after her initial meeting with Plaintiff, she "consulted with [her] supervisor, Debbie Combs-Jones. [Combs-Jones] and [Anderson] agreed that [Plaintiff] needed to provide ... a note from a medical doctor in order to be excused from taking a flu shot. This standard applied to all employees who asked to be excused from taking a flu shot."
Anderson's affidavit also stated the following:
At approximately 3 p.m. on Friday December 7, 2012, in another and final attempt to assure that [Plaintiff] had sufficient opportunity to consider her decision and seek medical doctor input, I called [Plaintiff] at her home and reviewed for a final time [Plaintiff's] position as I understood it. Ms. Connie Ostler, our facility human resources professional, was present for this discussion. The following points were reviewed: 1) [Plaintiff] had no justification that allowed her an exception; 2) [Plaintiff] did not have an allergy to eggs; 3) [Plaintiff] had been encouraged to seek advice from a medical doctor; 4) [Dr. Robson] was willing to answer any questions [Plaintiff] had about the actual vaccine; 5) [Plaintiff] acknowledged that she did not state a medical justification that made her eligible for an exception by the CDC; 6) [Plaintiff] had the justification for the requirement of the vaccination explained to her, including the fact that [Plaintiff's] position as Activities Director required that she have ongoing contact with the residents of [the Facility]; 7) [Plaintiff] had been offered an opportunity to think about her decision before committing to a final decision. [Plaintiff] agreed to the above points of discussion. [Plaintiff] further stated that she did not wish to speak to [Dr. Robson] because he had "already made up his mind."
*558 Anderson's unambiguous testimony established that Plaintiff was discharged because "she refused to take a flu shot without providing a medical excuse from a medical doctor ... [H]er religion played no role in [the] decision." Accordingly, Defendant has met its burden of articulating a nondiscriminatory reason for her discharge. See Johnson, --- N.C.App. at ----, 749 S.E.2d at 109 ("Defendant rebutted plaintiff's [prima facie ] case [for wrongful discharge in violation of North Carolina public policy] by producing evidence of a legitimate, nondiscriminatory reason for plaintiff's dismissal[.]").
3. Pretext
Because Defendant met its burden of setting forth a legitimate nondiscriminatory reason for discharging Plaintiff, the burden shifts back to Plaintiff to show that Defendant's asserted ground is merely a pretext for discrimination. See Newberne v. Dep't of Crime Control & Pub. Safety, 359 N.C. 782, 791, 618 S.E.2d 201, 207 (2005) ("If the defendant meets this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is pretextual."). "To raise a factual issue regarding pretext, the plaintiff's evidence must go beyond that which was necessary to make a prima facie showing by pointing to specific, non-speculative facts which discredit the defendant's [nondiscriminatory] motive." Manickavasagar v. N.C. Dept. of Pub. Safety, ---N.C.App. ----, ----, 767 S.E.2d 652, 659 (2014) (citation and quotation marks omitted).
Plaintiff makes several arguments in an attempt to show that Defendant's asserted nondiscriminatory reason for her discharge was pretextual. Based on our thorough review of the entire record, we conclude that she has failed to meet her burden on this issue. We address each of her arguments in turn.
First, she contends that by refusing to accept Dr. Hollar's letter, Defendant treated her differently than the three employees who were excused from the vaccine requirement based on their submission of letters from medical providers. The flaw with her argument is that the 2 December 2012 notice *913 explaining the mandatory vaccination policy to Defendant's employees required a "physician statement" containing a "specific medical justification" in order to be exempt from the vaccine requirement. We believe that Defendant could have reasonably determined that Dr. Hollar's letter did not comply with these requirements.
It is undisputed that Dr. Hollar was a chiropractor. Our General Assembly has made clear that
*559 [a]ny person obtaining a license from the Board of Chiropractic Examiners shall have the right to practice the science known as chiropractic, in accordance with the method, thought, and practice of chiropractors, as taught in recognized chiropractic schools and colleges, but shall not prescribe for or administer to any person any medicine or drugs, nor practice osteopathy or surgery.
N.C. Gen.Stat. § 90-151 (2013) (emphasis added). "Chiropractic" is statutorily defined as "the science of adjusting the cause of disease by realigning the spine, releasing pressure on nerves radiating from the spine to all parts of the body, and allowing the nerves to carry their full quota of health current (nerve energy) from the brain to all parts of the body." N.C. Gen.Stat. § 90-143(a) (2013). North Carolina law recognizes the existence of limitations on a chiropractor's expertise in health matters. See N.C. Gen.Stat. § 90-157.2 (placing limits on medical issues as to which chiropractors can provide expert testimony in a court of law). Notably, for purposes of the present case, N.C. Gen.Stat. § 90-151 expressly mandates that a chiropractor "shall not prescribe for or administer to any person any medicine or drugs[.]" N.C. Gen.Stat. § 90-151.
Plaintiff argues that Defendant's refusal to accept the letter from Dr. Hollar, a chiropractor, cannot be reconciled with the fact that it accepted a note from a physician assistant offered by one of the three employees who was granted an exception from the vaccine requirement. However, pursuant to N.C. Gen.Stat. § 90-18.1, physician assistants are authorized-subject to certain conditions-to "write prescriptions for drugs," "compound and dispense drugs," and "order medications, tests and treatments in hospitals, clinics, nursing homes, and other health facilities." N.C. Gen.Stat. § 90-18.1(b) - (d) (2013).
We recognize that chiropractors provide valuable services to their patients for the types of physical conditions encompassed by N.C. Gen.Stat. § 90-143. We are also cognizant of the fact that physician assistants provide medical care only under the supervision of a licensed physician. However, as shown above, physician assistants are authorized to perform a number of services in the course of providing medical care to patients that chiropractors lack the power to provide.
Given that the issue here concerned the existence of a medical justification for refusing a flu vaccine, we cannot say that it was illogical under these circumstances for Defendant to accept a note from a physician assistant while refusing to accept the letter from Dr. Hollar. Thus, we believe that Defendant's actions in this regard were neither *560 objectively unreasonable nor suggestive of an impermissible motive to discriminate against Plaintiff's religious beliefs.
Furthermore, key differences existed between the medical justification cited in Dr. Hollar's letter as compared with those contained in the notes submitted by the three employees who sought-and received-exemptions from the vaccination requirement. According to the notes submitted on behalf of those employees, one had experienced a past adverse reaction to the flu vaccine and the remaining two were allergic to eggs.
Conversely, the letter from Dr. Hollar merely stated that Plaintiff had previously suffered from an autoimmune disease. While Dr. Hollar made a vague reference to a fear of "compromising her immune system," the letter neither (1) identified an actual link between the autoimmune disease she had experienced and the flu vaccine; nor (2) explained-even in general terms-how the flu vaccine had the potential to adversely affect her immune system. For this reason, Dr. Hollar's letter did not satisfy the requirement contained in the 2 December 2012 notice that a physician statement requesting an exemption for an employee state the "specific *914 medical justification" for refusing the vaccination.
We further note that Anderson encouraged Plaintiff to take additional time to think over her decision, offered her the opportunity to speak with Dr. Robson, and gave her the chance to submit a new letter from a physician. These acts by Anderson are inconsistent with the notion that Defendant used Plaintiff's refusal to take a flu shot as an excuse to terminate her on account of her religious beliefs.
As a second basis for attempting to establish pretext, Plaintiff asserts that the employees of Defendant's sister facility-Heartland Living & Rehabilitation ("Heartland") in Greensboro, North Carolina-were not required to take the flu vaccination, and, therefore, were not subject to discharge for refusing to do so. However, Anderson testified that Heartland "did not require its employees to receive a flu vaccine because it did not have a flu outbreak as defined by the CDC guidelines." Conversely, as a result of the flu outbreak at the Facility, three residents died, four were hospitalized, and 31 were diagnosed with upper respiratory infections.
For these reasons, it was logical for the Facility to impose a mandatory flu vaccination policy for its employees despite the absence of a comparable policy at Heartland, and Plaintiff cannot show that she was similarly situated to the employees at Heartland for purposes of establishing pretext. See Wang v. UNC-CH Sch. of Med., 216 N.C.App. 185, 204, 716 S.E.2d 646, 658 (2011) ("A Plaintiff relying on disparate treatment evidence must show that she was similarly situated in all material *561 respects to the individuals with whom she seeks to compare herself[.]" (citation, quotation marks, and alteration omitted)).
Finally, Plaintiff argues that the letter she obtained on 28 January 2013 from Dr. Leighton, a physician, established a medical justification for her refusal to take the flu shot. However, she obtained this letter over a month after her discharge and never provided the letter to Anderson. Nor did Plaintiff ever request that she be reinstated following her termination. Therefore, the existence of Dr. Leighton's letter lacks any relevance to Defendant's justification for terminating her employment over one month earlier.
We are satisfied that none of Plaintiff's arguments-either singularly or in combination-are sufficient to raise a genuine issue of material fact as to whether Defendant's asserted rationale for her discharge was a pretext for religious discrimination. See Fatta v. M & M Props. Mgmt., Inc., 221 N.C.App. 369, 375-76, 727 S.E.2d 595, 601 (2012) ("Viewing the evidence in the light most favorable to plaintiff, there is no genuine issue of material fact with respect to the pretext issue. Accordingly, we affirm the trial court's order granting summary judgment in favor of defendant." (internal citation omitted)), disc. review denied, 366 N.C. 601, 743 S.E.2d 182, 182-83 (2013). As this Court has recognized,
a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action. It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff. Even in discrimination cases where motive and intent are critical to the analysis, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation.
Id. at 375, 727 S.E.2d at 601 (internal citations and quotation marks omitted). We conclude that this is such a case.
Conclusion
For the reasons stated above, we affirm the trial court's order granting summary judgment in favor of Defendant.
AFFIRMED.
Judges BRYANT and INMAN concur.

Plaintiff does not challenge the trial court's entry of summary judgment as to her claim that her discharge violated North Carolina's public policy against interfering with the physician-patient relationship. Therefore, that issue is not before us in this appeal. See N.C.R.App. P. 28(b)(6) ; Wilkerson v. Duke Univ., --- N.C.App. ----, ----, 748 S.E.2d 154, 161 (2013) ("Plaintiff makes no argument on appeal that the trial court erred in granting summary judgment in favor of defendants with regards to his claims of public stigmatization and negligence. These arguments are deemed abandoned.").