EURY v. N.C. EMPLOYMENT SECURITY COMM.

[115 N.C. App. 590 (1994)]

CRAIG STAN EURY, JR. AND KENNETH WHITE, PETITIONERS/APPELLEES v. NORTH CAROLINA EMPLOYMENT SECURITY COMMISSION, RESPONDENT/APPELLANT

No. 9310SC935

(Filed 2 August 1994)

1. **Administrative Law and Procedure § 72 (NCI4th)— errors of law—scope of review**

Because some of respondent's assignments of error in an appeal from a superior court order reversing a decision of the State Personnel Commission presented errors of law, the Court of Appeals conducted a *de novo* review of those issues.

**Am Jur 2d, Administrative Law §§ 769-774.**

2. **Discovery and Depositions § 52 (NCI4th)— formal offer of proof—interpretation of admission—error by trial court**

In an action arising out of the dismissal of petitioners who were employees of respondent, the trial court erred by improperly construing respondent Employment Security Commission's admissions and by concluding that respondent had failed to make a formal offer of proof of testimony excluded by those admissions, since respondent was not permitted to make a showing in the record of what it proposed to prove, and the trial court interpreted the admissions in an unduly broad manner to include material not contained in the language of the admission request.

**Am Jur 2d, Depositions and Discovery §§ 353 et seq.**

3. **Public Officers and Employees § 65 (NCI4th)— suspension of state employees—reasons—sufficiency of notice to employees**

The superior court erred in concluding that respondent state agency had not given petitioners sufficient notice of the reasons for their investigatory suspension pursuant to 25 N.C.A.C. 01J .0610(6), since petitioners were apprehended and arrested on 12 July 1989 for the manufacture of marijuana and possession of drug paraphernalia; on the next day petitioners admitted to their superior that they had been arrested for growing marijuana; and petitioners were placed on investigatory suspension on 14 July 1989 by letter informing them that the reason for suspension was

EURY v. N.C. EMPLOYMENT SECURITY COMM.

[115 N.C. App. 590 (1994)]

the "need to investigate allegations concerning your personal conduct which could affect your work status."

**Am Jur 2d, Civil Service §§ 52 et seq.**

4. **Public Officers and Employees § 67 (NCI4th)— off-duty criminal conduct by state employees—just cause for dismissal**

Where a state employee has engaged in off-duty criminal conduct, the agency need not show actual harm to its interests to demonstrate just cause for an employee's dismissal; rather, the agency must demonstrate that the dismissal is supported by the existence of a rational nexus between the type of criminal conduct committed and the potential adverse impact on the employee's future ability to perform for the agency.

**Am Jur 2d, Civil Service § 63.**

Appeal by respondent from order filed 29 June 1993 by Judge Gregory A. Weeks in Wake County Superior Court. Heard in the Court of Appeals 10 May 1994.

The North Carolina Employment Security Commission (hereinafter "Respondent-ESC") appeals from the Superior Court's order reversing the decision of the State Personnel Commission to dismiss petitioners from employment. Petitioners Craig Stan Eury, Jr., and Kenneth W. White were employed by respondent-ESC on 25 January 1977 and 1 May 1979 respectively. Petitioners were permanent state employees employed in Rural Manpower Representative I positions. Respondent's Exhibit 19 is a job description which describes the "nature of work" of a Rural Manpower Representative I position as follows:

This is specialized employment service work in the recruitment and placement of farm labor.

Employees are responsible for determining farm labor needs and availability in a specific area or county and for formulating plans to secure workers to meet these needs. Work includes registering all principal farm employers, recording crop acreages and anticipated labor requirements, taking orders for all agricultural work, referring workers to growers, and recruiting workers from outside areas to meet labor needs. Employees are expected to use initiative and to make decisions independently since a majority of their duties are performed alone and outside the

office. General supervision is received from an employment office manager or higher-level rural manpower representative through periodic conference, and work is reviewed and evaluated by them through written reports and records.

Regarding petitioners' positions with respondent-ESC, an administrative law judge made the following findings of fact which were thereafter adopted by the State Personnel Commission:

5. ESC is an agency of the State charged with the administration of Chapter 96 of the General Statutes of North Carolina, the Employment Security Law. Further, ESC is charged with enforcing federal and state law with regard to migrant and seasonal workers' housing and certification to work.

6. One of the goals of ESC is to match farm labor with farm jobs and to provide protection of migrant farm labor through proper administration of the federal and state law and reporting of violations of any other state and federal law to appropriate regulatory agencies.

7. In order to administer the Rural Manpower Services Program, it is necessary for ESC employees to accurately collect and report certain information concerning employers and employees in the State, meet with and educate the agricultural community of the services available to it, and coordinate the employment needs and employment placement.

8. As RMR I's, the petitioners' job duties included the following activities: engage in the specialized employment service work in the recruitment and placement of farm labor; determine farm labor needs and availability in a specific area or county, and formulate plans to secure workers to meet these needs; report to appropriate state and federal agencies any violations of wage and hour laws, violations of migrant and seasonal labor laws, etc.

9. The work of RMR I's includes: registering all principal farm employers, recording crop acreage and anticipated labor requirements, taking orders for all agricultural work, referring workers to growers, and recruiting workers from outside areas to meet labor needs.

10. Although their job duties and responsibilities could necessitate working additional hours, the petitioners' established work hours were from 8:00 a.m. to 5:00 p.m., Monday through Friday.

11. The ESC's RMRs are given a tremendous amount of freedom to circulate among the target population in order to collect the necessary information and coordinate the employment and placement activities. [The State Personnel Commission supplemented this finding as follows: "Petitioners admitted that they could not perform their job well without the tremendous flexibility and independence afforded them by ESC. Petitioners admitted that their outstanding performance was due in part to the flexibility afforded them by ESC."]

12. Employees who are RMRs are expected to use initiative and to make decisions independently because a majority of their duties are performed alone and outside the office.

13. The RMRs are given telephone credit cards belonging to the State of North Carolina; freedom to complete time and overtime compensation records; freedom to complete mileage reports for travel expense reimbursement; freedom to write up job orders from the agricultural community; and independently arrange meetings of migrant farm labor crews and farmers in need of their services.

14. The telephone credit cards belonging to the State are to be used to charge calls that are made solely in connection with carrying out State business.

15. Mileage reports are to accurately reflect miles traveled in the performance of their duties for which employees would be reimbursed.

16. Time records and overtime compensation records are to accurately reflect the time that employees spend performing their jobs and compensatory time due them for overtime hours worked.

On Wednesday 12 July 1989 at approximately 4 p.m., law enforcement officers spotted petitioners watering marijuana plants at a remote, rural field. Petitioners were arrested for the manufacture of marijuana and possession of drug paraphernalia. After they were arrested and read their rights, petitioners admitted that they had planted the marijuana. (Petitioners later testified that the marijuana was grown for their personal use.) Petitioners did not know who owned the land. Petitioner White's vehicle was impounded. Respondent-ESC's records indicate that at the time of their arrest both petitioners had previously signed out, signifying the end of their work on that

date. From their written indications on the sign-out sheets, petitioners were on compensatory time at the time they were arrested in the marijuana field. During the evening of 13 July 1989, petitioners admitted to their superiors that they had been arrested for growing marijuana but refused requests to disclose any other pertinent details. Petitioners were placed on investigatory suspension by letter dated 14 July 1989 informing them that "[t]he specific reason for your investigatory suspension without pay is the need to investigate allegations concerning your personal conduct which could affect your work status." '

In the criminal action, on 14 September 1989 the felony charges of manufacturing marijuana and possession of drug paraphernalia were dismissed and petitioners pleaded no contest to the misdemeanor charge of maintaining a vehicle for the transportation of a controlled substance. G.S. 90-108(a)(7). Petitioner White forfeited his truck to the Moore County Sheriff's Department, and petitioner Eury paid an equivalent amount in cash. In addition, each petitioner was required to perform 200 hours of community service work. Upon completion of the conditions, the remaining criminal charges were dismissed in 1990 and petitioners' criminal records were expunged. See G.S. 15A-146; G.S. 90-96(b).

On 29 September 1989, respondent-ESC's management officials conducted a pre-dismissal conference pursuant to 25 N.C.A.C. 01J .0606 at which both petitioners admitted that they had illegally grown marijuana for their personal use and had possessed paraphernalia for growing marijuana. Respondent-ESC's management officials recommended petitioners' dismissal. Petitioners were dismissed from state employment effective 5 October 1989 based upon the growing of marijuana, on property not owned by them, while on paid leave status.

Petitioners filed a request for contested case hearing challenging their dismissal. Prior to the hearing, petitioners served a request for admissions on respondent-ESC. Respondent-ESC did not file a timely response and those requests for admissions, infra, were deemed admitted per G.S. 1A-1, Rule 36. The administrative law judge denied respondent-ESC's motion to amend or withdraw the admissions, denied a subsequent motion to amend, and granted petitioners' motion in limine to exclude any testimony or evidence on matters deemed admitted. Because of these admissions, respondent-ESC could not offer evidence regarding the opinions of respondent-ESC's higher level management and administrators regarding inter alia the impact of petitioners' conduct on the agency or on management's

EURY v. N.C. EMPLOYMENT SECURITY COMM.

[115 N.C. App. 590 (1994)]

trust in petitioners to perform their duties. During the proceedings, respondent-ESC argued that the admissions should not be interpreted in an unduly broad manner to include material not contained in the language of the admission request. In a recommended decision filed 13 January 1992, the administrative law judge found "no just cause" for petitioners' dismissal, found the notice of investigatory suspension inadequate, and recommended that petitioners be reinstated to their former positions with full back pay dating back to the date they were initially placed on investigatory suspension.

In a "Decision and Order" dated 26 June 1992, the State Personnel Commission (hereinafter "Personnel Commission") adopted most of the administrative law judge's findings of fact but declined to adopt most of the conclusions of law and the recommended decision. The Personnel Commission found for respondent-ESC on the admissions issue, stating that the administrative law judge "improperly expanded the scope of the respondent[-ESC]'s admissions and improperly excluded testimony regarding the effect of the petitioners' conduct on their continued employment." In upholding respondent-ESC's dismissal of petitioners, the Personnel Commission's "Decision and Order" provided *inter alia* as follows:

> Petitioners were charged with and have admitted to the felonious manufacture of marijuana and possession of drug paraphernalia. The petitioners admitted to riding around Moore and surrounding counties in order to find a remote location because " . . . it was just a [sic] understanding that, you're going to do something illegal you have to have a remote, remote location." These fields were not unlike the fields to which respondent assigned petitioners to carry out the responsibilities of their jobs. Respondent is charged with continuing to maintain the public trust vested in the agency and to employ persons who would not engage in unacceptable conduct. Respondent has established just cause for the dismissals of petitioners White and Eury.

Petitioners sought judicial review of the administrative proceedings pursuant to G.S. 150B-43. By order filed 29 June 1993, the Superior Court found that there was no admissible or substantial evidence in the record which contradicted or warranted rejection of the findings and conclusions of the administrative law judge. The Superior Court reversed the Personnel Commission's decision, holding that there was no just cause for the dismissal of petitioners. From the Superior Court's 29 June 1993 order reversing the decision of the Personnel Commission, respondent-ESC appeals.

*Robert J. Willis for petitioner-appellees.*

*Chief Counsel Thomas S. Whitaker, by Alfreda Williamson and Thelma M. Hill, for respondent-appellant.*

EAGLES, Judge.

Respondent-ESC brings forth several assignments of error. After careful review, we reverse the Superior Court's 29 June 1993 order and remand to the Superior Court for remand to the Personnel Commission.

## I. *Standard of Review*

**[1]** The North Carolina Administrative Procedure Act, G.S. 150B-1 *et seq.*, governs both trial and appellate court review of administrative agency decisions. G.S. 150B-51 governs the scope of the Superior Court's review of final agency decisions. G.S. 150B-51(b) provides:

> . . . [T]he court reviewing a final decision may affirm the decision of the agency or remand the case for further proceedings. It may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious.

Regarding the review of the decisions of administrative agencies, in *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 674-75, 677, 443 S.E.2d 114, 118-19 (1994), this Court stated:

> Although the statute [G.S. 150B-51(b)] lists the grounds upon which the superior court may reverse or modify a final agency decision, the proper manner of review depends upon the particular issues presented on appeal.

**EURY v. N.C. EMPLOYMENT SECURITY COMM.**

[115 N.C. App. 590 (1994)]

> If [petitioner] argues the agency's decision was based on an error of law, then "*de novo*" review is required. If, however, [petitioner] questions (1) whether the agency's decision was supported by the evidence or (2) whether the decision was arbitrary or capricious, then the reviewing court must apply the "whole record" test.

"*De novo*" review requires a court to consider a question anew, as if not considered or decided by the agency. The "whole record" test requires the reviewing court to examine all competent evidence (the "whole record") in order to determine whether the agency decision is supported by "substantial evidence."

As to appellate review of a superior court order regarding an agency decision, however, the APA simply specifies "[a] party to a review proceeding in a superior court may appeal to the appellate division from the final judgment of the superior court. . . ." N.C.G.S. § 150B-52.

. . . .

. . . [O]ur review of a trial court's order under G.S. § 150B-52 "is the same as in any other civil case—consideration of whether the court committed any error of law." Under this approach, the appellate court examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly.

. . . .

. . . . [W]here the initial reviewing court should have conducted *de novo* review, this Court will directly review the State Personnel Commission's decision under a *de novo* review standard.

(Citations omitted.) "It is well established that an agency has the ability to reject the recommended decision of an administrative law judge. . . . Even though the administrative law judge ha[s] already made findings of fact and conclusions of law, the Personnel Commission ha[s] the ability to make its own findings of fact and conclusions of law if it cho[oses] to do so." *Davis v. N.C. Dept. of Human Resources*, 110 N.C. App. 730, 737, 432 S.E.2d 132, 136 (1993) (*citing Webb v. N.C. Dept. of Environmental Health and Natural Resources*,

102 N.C. App. 767, 404 S.E.2d 29 (1991); *Jarrett v. N.C. Dept. of Cultural Resources*, 101 N.C. App. 475, 400 S.E.2d 66 (1991)). *See also Oates v. N.C. Dept. of Correction*, 114 N.C. App. 597, 442 S.E.2d 542 (1994); *Ford v. N.C. Dept. of Environment, Health and Natural Resources*, 107 N.C. App. 192, 199, 419 S.E.2d 204, 208 (1992).

Here, some of the assignments of error have presented errors of law and accordingly we have conducted a *de novo* review of those issues. In light of the errors of law and the resultant incomplete condition of the record, we do not consider respondent-ESC's remaining assignments of error, including whether there was substantial evidence to support the Personnel Commission's order of dismissal. We remand the cause to the Superior Court for remand to the Personnel Commission for further hearing.

## II. *Scope of Admissions and Offer of Proof*

[2] Respondent-ESC argues that the Superior Court erred by improperly construing respondent-ESC's admissions and by concluding that respondent-ESC had failed to make a formal offer of proof of testimony excluded by those admissions. We agree.

G.S. 1A-1, Rule 36 provides:

(a) *Request for admission.*—A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to fact . . . .

Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by his attorney . . . .

(b) *Effect of admission.*—Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provisions of Rule 16 governing amendment of a pretrial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that

withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.

G.S. 1A-1, Rule 36. *See* G.S. 150B-28(a); 26 N.C.A.C. 03 .0012. The Comment to G.S. 1A-1, Rule 36 notes that "[i]n form and substance a Rule 36 admission is comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial, rather than to an evidentiary admission of a party." *See also* 2 K. Broun, *Brandis & Broun on North Carolina Evidence*, § 198, at 23 (4th Ed. 1993) (failure to respond to a pretrial demand for admissions constitutes a judicial admission). In *Contractors, Inc. v. Forbes*, 302 N.C. 599, 604-05, 276 S.E.2d 375, 379-80 (1981), our Supreme Court set forth the guidelines for the construction of judicial admissions:

> A judicial admission is a formal concession which is made by a party in the course of litigation for the purpose of withdrawing a particular fact from the realm of dispute. *See generally* 2 Stansbury's North Carolina Evidence § 166 (Brandis rev. 1973). Such an admission is not evidence, but it, instead, serves to remove the admitted fact from the trial by formally conceding its existence. *E.g.*, *State v. McWilliams*, 277 N.C. 680, 178 S.E.2d 476 (1971). Stipulations are viewed favorably by the courts because their usage tends to simplify, shorten, or settle litigation, as well as save costs to litigants. *Rickert v. Rickert*, 282 N.C. 373, 193 S.E.2d 79 (1972); *Rural Plumbing and Heating, Inc. v. H. C. Jones Construction* Co., 268 N.C. 23, 149 S.E.2d 625 (1966); *Chisolm v. Hall*, 255 N.C. 374, 121 S.E.2d 726 (1961). Yet, the effect or operation of a stipulation will not be extended by the courts beyond the limits set by the parties or by the law. *Rickert v. Rickert, supra; Lumber Co. v. Lumber Co.*, 137 N.C. 431, 49 S.E. 946 (1905). In determining the extent of the stipulation, it is appropriate to look to the circumstances under which it was entered, as well as to the intentions of the parties as expressed by the agreement. *Rickert v. Rickert, supra.* Stipulations will receive a reasonable construction so as to effect the intentions of the parties, but in ascertaining the intentions of the parties, the language employed in the agreement will not be construed in such a manner that a fact which is obviously intended to be controverted is admitted or that a right which is plainly not intended to be waived is relinquished. *Id.*

Here, petitioners served on respondent-ESC a "Request For Admissions" on 20 June 1990. The section of the Request entitled "Instructions" stated *inter alia* as follows:

12. Unless otherwise specifically indicated, when used in this discovery request, the phrase "discernible negative impact" shall be defined in the way that that same phrase was used and/or defined in the case of *National Cash Register*, 70 Labor Arbitration Reports 756, 759.

13. Unless otherwise specifically indicated, when used in this discovery request, the phrase "Event #1" shall be defined to refer to and include the information contained in the following sentence: "During the afternoon hours on Wednesday, July 12, 1989, the Plaintiffs admitted to Det. Sgt. T.D. Monroe, Det. Sgt. C. Goodnight, and Sgt. Ralph Simmons that the plaintiffs had been growing marijuana on or before July 12, 1989, and that all the marijuana plants and paraphernalia discovered by those same law officers on or before July 12, 1989 at the turn off of NC 705 onto RUPR 1300, opening near end of road, belonged to the plaintiffs."

14. Unless otherwise specifically indicated, when used in this discovery request, the phrase "Event #2" shall be defined to refer to and include the information contained in the following sentence: "The plaintiffs admitted to Manfred Emmrich and Leroy Singleton in the Plaintiffs' pre-dismissal conference with those two persons in 1989 that they had been growing marijuana on or before July 12, 1989, and that all the marijuana plants and paraphernalia discovered by Det. Sgt. T.D. Monroe, Det. Sgt. C. Goodnight, and Sgt. Ralph Simmons on or before July 12, 1989 at the turn off of NC 705 onto RUPR 1300, opening near end of road, belonged to the plaintiffs."

Respondent-ESC was requested to admit, *inter alia*, each of the following statements:

4. The criminal proceeding(s) against the plaintiffs which resulted from Event #1 did not have any discernable negative impact on the ability of the plaintiffs to circulate freely without any doubt in the minds of the supervisors of the plaintiffs as to the real nature of the plaintiffs' absence from the ESCNC office.

5. The criminal proceeding(s) against the plaintiffs which resulted from Event #1 did not actually create a situation in which there was any discernable negative impact on the plaintiffs' ability to work with any migrant workers, farmers, and agricultural businesses in job placement activities in Richmond, Lee, and Moore County, North Carolina.

. . . .

8. Event #2 did not have any discernable negative impact on the ability of the plaintiffs to circulate freely without any doubt in the minds of the supervisors of the plaintiffs as to the real nature of the plaintiffs' absence from the ESCNC office.

9. Event #2 did not actually create a situation in which there was any discernable negative impact on the plaintiffs' ability to work with any migrant workers, farmers, and agricultural businesses in job placement activities in Richmond, Lee, and Moore County, North Carolina.

Respondent-ESC failed to respond to the request for admissions. The administrative law judge deemed the statements admitted pursuant to G.S. 1A-1, Rule 36. Respondent-ESC contends that the Superior Court erred in reversing the Personnel Commission's conclusion of law which stated as follows:

The responsibilities of the positions held by the petitioners required that they enjoy a great deal of freedom, independence, discretion and trust in carrying out the day to day requirements of the job requirements of the job. The admissions by the petitioners to the arrest for their actions of growing marijuana in fields not unlike the fields in which they routinely spent their time carrying out the responsibilities of their jobs, reasonably and substantially compromised if not negated respondent's ability to continue to extend this trust in good faith. Respondent so articulated this in its dismissal letters to the petitioners. The letters stated in part:

This personal conduct of yours on July 12, 1989 has created a situation in which the trust and flexibility necessary for the employer-employee relationship to go forward as in the past has been destroyed. In your role as Rural Manpower Representative, the ability to circulate freely without doubt in the minds of your supervisors as to the real nature of your absence from the office is essential. To have breached that relationship is inexcusable and grounds for dismissal for improper personal conduct.

. . . [T]he Administrative Law Judge *improperly expanded the scope* of the respondent's admissions and improperly excluded testimony regarding the effect of the petitioners' conduct on their continued employment. Respondent addressed this concern specifically in the dismissal letter of October 5, 1989 which pre-

ceded the request for admissions. Further, *even if admitted*, the admissions relate only to the immediate supervisors of the petitioners as indicated in plaintiff's instructions.

(Emphasis added.) In addition to reversing this conclusion of law by the Personnel Commission, the Superior Court held that respondent-ESC failed to make an adequate offer of proof.

### A. Offer of Proof

First, we address the sufficiency of the offer of proof. Generally, in a civil action in our General Courts of Justice when an objection is sustained, an offer of proof must be made. G.S. 1A-1, Rule 43(c). *See Currence v. Hardin*, 296 N.C. 95, 99, 249 S.E.2d 387, 390 (1978) (jury trial for personal injury and property damage; where there is an objection "to the admissibility of testimony . . . the significance of the excluded evidence must be made to appear in the record if the matter is to be heard on review"). However, it has been held that evidentiary procedures before administrative agencies are not so formal as litigation conducted in the superior courts. *Utilities Comm. v. Springdale Estates Assoc.*, 46 N.C. App. 488, 491, 265 S.E.2d 647, 649-50 (1980); *Utilities Comm. v. Telegraph Co.*, 267 N.C. 257, 148 S.E.2d 100 (1966). *Accord, Cohn v. Industrial Com'n of Arizona*, —— Ariz. ——, 874 P.2d 315 (1994) (offer of proof before administrative law judge); *Amey v. Industrial Com'n of Arizona*, 156 Ariz. 390, 752 P.2d 43 (1988) (offer of proof before administrative law judge); *Ray v. Georgia-Pacific Corp.*, 1 Ark.App. 196, 614 S.W.2d 676, *aff'd*, 273 Ark. 343, 619 S.W.2d 648 (1981) (offer of proof before administrative law judge); *Bivins Const. v. State Contractors' Board*, 107 Nev. 281, 809 P.2d 1268 (1991); *cf. Pennsylvania Social Services Union v. Com., Pennsylvania Bd. of Probation and Parole*, 96 Pa.Cmwlth 461, 467, 508 A.2d 360, 364 (1986). *See generally*, G.S. 150B-29(a) (listing exceptions to rules of evidence); 26 N.C.A.C. 03 .0121; 1 K. Broun, *Brandis & Broun on North Carolina Evidence*, § 4, at 13 (4th Ed. 1993).

Here, the substance of the testimony sought to be introduced in light of the admissions was forecast by counsel for respondent-ESC during arguments on petitioners' motion in limine before the administrative law judge at the inception of the hearing. The record further shows that any testimony regarding the issues involved in the admissions, upon objection from petitioners' counsel, was ordered by the administrative law judge to be stricken from the record and not to appear in the transcript. Other than the arguments made during the

motion in limine, respondent-ESC was not permitted to make a showing in the record of what it proposed to prove. *See* G.S. 150B-29(b) ("Evidence in a contested case . . . shall be offered and *made a part of the record*.") Upon review of the record, we conclude that the significance of the substance of the excluded testimony was sufficiently made to appear in the record to effectively preserve the matter for review by the Personnel Commission. We note that, unlike trials before our General Courts of Justice, there was no jury that could have been tainted here: the administrative law judge should have permitted the excluded testimony itself to appear in the transcript of the hearing as an offer of proof. *See Molloy v. Molloy*, 158 Ariz. 64, 68, 761 P.2d 138, 142 (App. 1988) (offer of proof "serves the *dual function* of enabling the trial court to appreciate the context and consequences of an evidentiary ruling and enabling the appellate court to determine whether any error was harmful").

### B. Scope of Admissions

Given that respondent-ESC's offer of proof was sufficient to preserve its objection, we next turn to the propriety of the Personnel Commission's decision regarding the scope of the admissions. This Court has held in *civil actions* in our General Courts of Justice that a trial court's decision whether or not to grant a G.S. 1A-1, Rule 36 motion is a discretionary one. *Whitley v. Coltrane*, 65 N.C. App. 679, 681, 309 S.E.2d 712, 715 (1983) ("Rule 36(b) of the North Carolina Rules of Civil Procedure provides that 'the court may permit withdrawal' of the admission, making the ruling upon a motion to withdraw an admission discretionary with the trial court"); *Interstate Highway Express v. S & S Enterprises, Inc.*, 93 N.C. App. 765, 769, 379 S.E.2d 85, 87 (1989) ("We hold that the language of the Rule clearly gives the trial court the discretion to allow or not allow a party to withdraw admissions and that in the exercise of that discretion it was not required to consider whether the withdrawal of the admissions would prejudice plaintiff in maintaining its action"). *See Little v. Penn Ventilator, Inc.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) (test for abuse of discretion requires the reviewing court to determine whether a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision). However, this is an appeal from an administrative proceeding. Here, the Superior Court serves the function of an initial appellate court. *Rector v. N.C. Sheriffs' Educ. and Training Standards Com'n.*, 103 N.C. App. 527, 532, 406 S.E.2d 613, 617 (1991); *Thompson v. Wake County Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541

(1977). At the other end of the spectrum, the administrative law judge *recommends* a decision to the ultimate factfinder, the Personnel Commission. G.S. 150B-34(a). While the administrative law judge must render a decision on the motion which is presented, G.S. 150B-33(b), 26 N.C.A.C. 03 .0015, the administrative law judge's ruling is subject to review by the ultimate factfinder, the Personnel Commission. G.S. 126-37(a); G.S. 150B-36; 25 N.C.A.C. 01B .0437. While the Personnel Commission's conclusions of law do not explicitly address how the Personnel Commission viewed the administrative law judge's denial of respondent-ESC's motion to withdraw the admissions, we conclude that the abuse of discretion standard is appropriate in reviewing the Personnel Commission's conclusions regarding the scope of the admissions. As correctly noted by the Personnel Commission, admissions 4 and 8 specifically refer only to "supervisors": admissions 5 and 9 do not even refer to "supervisors." Additionally, no admission refers explicitly to members of respondent-ESC's upper level management or administrators. *See* G.S. 1A-1, Rule 36(a) ("Each matter of which an admission is requested shall be *separately* set forth"). We note that the request for admissions specifically defines several terms, but that the term "supervisors" is not one of them. Given this lack of specificity and the rules of construction set forth in *Contractors, Inc., supra,* the Personnel Commission's construction of the admissions cannot be said to be manifestly unsupported by reason on this record. Accordingly, we find no abuse of discretion by the Personnel Commission.

### III. *Notice of Investigatory Suspension*

**[3]** Respondent-ESC argues that the Superior Court erred in concluding that respondent-ESC had not given sufficient notice of the reasons for the investigatory suspension pursuant to 25 N.C.A.C. 01J .0610(6). We agree and reverse.

25 N.C.A.C. 01J .0610(6) provides that "[a]n employee who has been suspended without pay must be furnished a statement in writing setting forth the specific acts or omissions that are the reasons for the suspension and the employee's appeal rights." 25 N.C.A.C. 01B .0432(b) provides that "[f]ailure to give specific reasons for dismissal, demotion or suspension without pay shall be deemed a procedural violation. The Personnel Commission, in its discretion, may award back pay, attorney's fees, or both for such a violation." The Personnel Commission made the following conclusion regarding the notice of investigatory suspension:

**EURY v. N.C. EMPLOYMENT SECURITY COMM.**

[115 N.C. App. 590 (1994)]

. . . Respondent has shown that on or about the evening hours of July 13, 1989, the petitioners advised respondent that they had been "arrested for the manufacture of marijuana" on July 12, 1989. On the advice of counsel, the petitioners declined to share any further details surrounding the arrest. Following a discussion with the appropriate management personnel, respondent placed the petitioners on investigatory suspension without pay, based on the petitioners' admissions regarding their arrest. The July 14, 1989 letter notifying the petitioners of the suspension indicated that the purpose of the suspension was to "provide time to investigate, establish facts, and reach a decision concerning your employment status." The letter further indicated that the specific reason for the · suspension was the "need to investigate allegations concerning your personal conduct which could affect your work status."

Petitioners have alleged that respondent failed to comply with procedure in placing them on investigatory suspension without pay. Such failure if established, would constitute a procedural violation pursuant to 25 N.C.A.C. 01B .0432(b). This Commission concludes that respondent complied with the procedures based on the limited information available at the time. Petitioners were given oral notice of the investigatory suspension, followed by the July 14, 1989 letter citing the personal conduct admitted by the petitioners as the event that triggered the need for the investigation. All these events occurred immediately following petitioners' admission to their arrest for marijuana and at a time when no other performance or personal conduct violations were known or alleged. Respondent's only knowledge of the arrest at this time came from the admission by the petitioners as required by policy. Beyond the bare admission, the petitioners refused to share any further details, requiring the Respondent to initiate its own investigation to determine what if any effect the incident would have on the petitioners' employment status. Petitioners knew or reasonably should have known the basis for the suspension.

Before petitioners notified respondent-ESC of their misconduct, law enforcement authorities had arrested petitioners. This is significantly different from a situation in which an agency unilaterally points to an employee's conduct as the basis for imposing an investigatory suspension: there, the significance of notification of specific acts or omissions becomes critical because the employee may be

completely unaware that some standard or expectation of the agency has been violated. Here, petitioners' apprehension, arrest, and notification to respondent-ESC amply demonstrated that petitioners knew that they had acted in derogation of the law. Upon initially communicating with respondent-ESC, petitioners sought to protect their interests by withholding information from respondent-ESC. Respondent-ESC knew only what the petitioners had told them, i.e., that the arrest had occurred. *See Burrow v. Randolph County Board of Education*, 61 N.C. App. 619, 627, 301 S.E.2d 704, 708 (1983); *Lewis v. N.C. Dept. of Human Resources*, 92 N.C. App. 737, 740, 375 S.E.2d 712, 714 (1989). Ultimately, petitioners' dismissal arose from the conduct leading to their 12 July 1989 arrest. Given (1) the apprehension and arrest of petitioners; (2) the close proximity in time of the issuance of the letter by respondent-ESC to the time that petitioners first notified respondent-ESC, and; (3) the letter's express reference to "personal conduct," State Personnel Manual, Sec. 9, at 2-3, 25 N.C.A.C. 01J .0604, we conclude that the Personnel Commission did not err in concluding that "[p]etitioners knew or reasonably should have known the basis for the suspension." *Cf. In re Gregory v. N.C. Dept. of Revenue*, 93 N.C. App. 785, 786, 379 S.E.2d 51, 52 (1989) (rejecting Department of Revenue employee's argument that his failure to timely file tax returns did not constitute misconduct under G.S. 96-14(2) because the Department did not have such a rule; noting that "[p]etitioner's conduct being forbidden by statute, a work rule to the same effect was unnecessary"); *Woodland Joint Unified School Dist. v. Commission on Professional Competence*, 2 Cal.App.4th 1429, 1453, 4 Cal.Rptr.2d 227, 242 (1992). We note that the record contains letters dated 4 and 10 August 1989 from petitioners explicitly stating that it was their understanding "that they were suspended because of their arrest." Additionally, the record reflects that petitioners ably responded to the agency's charges during the period of their appeal. *See Employment Security Commission v. Wells*, 50 N.C. App. 389, 393, 274 S.E.2d 256, 259 (1981) ("An employee wishing to appeal his dismissal must be able to respond to agency charges and be able to prepare an effective representation").

### IV. Showing Required by the Agency for Dismissal Based Upon Criminal Acts by Employees

[4]  Respondent-ESC argues that the Superior Court erred in requiring respondent-ESC to show "that it was actually harmed by petitioners' personal misconduct and that petitioners actually lacked the ability to continue to work with respondent-ESC's clients." Our

**EURY v. N.C. EMPLOYMENT SECURITY COMM.**

[115 N.C. App. 590 (1994)]

research reveals no cases addressing an agency's dismissal of a state employee for criminal conduct occurring during off-duty hours. However, in a case rejecting an employee's claim for unemployment insurance benefits pursuant to G.S. 96-14(2), this Court held that "[a]n employee's misconduct need not occur at the workplace or in connection with employment tasks to violate expectable behavioral norms." *Lynch v. PPG Industries*, 105 N.C. App. 223, 225, 412 S.E.2d 163, 165 (1992) (*citing In re Collins v. B & G Pie Co.*, 59 N.C. App. 341, 296 S.E.2d 809 (1982), *disc. review denied*, 307 N.C. 469, 299 S.E.2d 221 (1983)).

In May 1989, respondent-ESC had established a "Policy for An Alcohol and Drug Free Workplace" which provided *inter alia* as follows:

EMPLOYMENT SECURITY COMMISSION
OF NORTH CAROLINA

POLICY FOR AN ALCOHOL AND DRUG FREE WORKPLACE

It is the policy of the Employment Security Commission of North Carolina that all employees shall have the right to a work place which is free of alcohol and drugs. This policy is established to ensure the safety and well being of employees of the Employment Security Commission, as well as the general public. All ESC employees including permanent full time, permanent part-time, trainee, and temporary will be covered by this policy.

It is the responsibility of management, supervisors, and employees to become familiar with the expectations of the Agency and to comply with the provisions of this policy.

Alcohol and drug abuse are a legitimate concern of management when they impact on the worksetting. Such abuse can directly affect the safety, productivity and general well-being of everyone concerned.

Therefore the Employment Security Commission has adopted the following position to address this concern:

. . . .

DEFINITIONS

For the purposes of this policy:

. . . .

WORKSITE or WORKPLACE shall be defined as any office, building, or property (including parking lots) or vehicle that is owned or operated by the State of North Carolina at which an employee is to perform work for the Employment Security Commission of North Carolina.

ILLEGAL DRUGS are drugs which are not legally obtainable and drugs which are legally obtainable but have been obtained illegally.

DISCIPLINARY ACTION UP TO AND INCLUDING DISMISSAL shall include both oral and written warnings, a transfer, a demotion in classification and/or pay, leave without pay for up to three days and dismissal. In keeping with State Personnel Regulations, the intent is to utilize the disciplinary process in a constructive, rather than punitive manner.

. . . .

## SECTION I

### ALCOHOL AND DRUG ABUSE AT THE WORKPLACE

A. ILLEGAL DRUG ACTIVITY

1. The manufacture, distribution, dispensing, possession or use of an illegal substance is prohibited.

An employee who violates this provision at the workplace is subject to disciplinary action up to and including dismissal. Any illegal drug activity will be reported to the appropriate law enforcement authority.

2. The employee is responsible for notifying management of the Employment Security Commission within five calendar days after arrest. Also, after indictment takes place, the employee is responsible for notifying management within five calendar days. Failure to do so will be addressed as a performance of duty requirement that has not been met.

3. Any employee convicted of any criminal drug statute violation must notify in writing the appropriate supervisor or management person no later than five (5) calendar days after such conviction. Failure to provide notification will result in automatic dismissal.

4. Any employee convicted of an off-the-job drug-related offense which could directly or indirectly affect the duties and

responsibilities of his/her position with the Agency shall be subject to disciplinary action up to and including dismissal.

Petitioner Eury (on 8 June 1989) and petitioner White (on 14 June 1989) each signed forms indicating that he had received a copy of the policy and that he realized that a violation of the policy could subject each of them "to discipline up to and including termination." At the time of petitioners' dismissal, respondent-ESC's "Policies for Corrective Action, Suspension and Dismissal" (hereinafter "Corrective Action Policy") provided *inter alia* as follows:

It is the intent of the Employment Security Commission to provide for employees and management a fair, clear and useful tool for correcting and improving performance problems, as well as to provide a process to assist management in handling instances of unacceptable personal conduct.

Any employee, regardless of occupation, position or profession may be warned, demoted, suspended or dismissed by the appointing authority. The degree and type of action taken shall be based upon the sound and considered judgment of the appointing authority in accordance with the provisions of this policy.

The basis for any corrective or disciplinary action taken in accordance with this policy falls into one of the two following categories:

(1) Discipline imposed on the basis of job performance;

(2) Discipline imposed on the basis of personal conduct.

. . . PERSONAL CONDUCT discipline is intended to be imposed for those actions for which no reasonable person could, or should, expect to receive prior warnings. . . .

. . . .

II. PERSONAL CONDUCT

Employees may be dismissed, demoted, suspended, warned or otherwise disciplined on the basis of unacceptable personal conduct. . . . Discipline may be imposed, as a result of unacceptable conduct, up to and including dismissal without any prior warning to the employee.

*See also State Personnel Manual*, Sec. 9, at pp. 2-3; 25 N.C.A.C. 01J .0604; 25 N.C.A.C. 01J .0608. Regarding actions involving personal conduct, the State Personnel Manual provides:

Generally, the form of discipline most often used in the PERSONAL CONDUCT process is dismissal. This is because PERSONAL CONDUCT discipline, unlike JOB PERFORMANCE discipline, is not progressive.

*Manual,* Sec. 9, at p. 8.3. In rejecting the petitioner's contention that an employer had to show actual harm to its interests to prove employee "misconduct" under G.S. 96-14, the *Lynch* Court stated:

> . . . Petitioner was discharged from employment with PPG Industries following his conviction for possession of cocaine with intent to sell or deliver, in violation of N.C.G.S. § 90-95(a)(1). The ESC accepted the appeal referee's findings of fact that petitioner "never consumed illegal drugs while at work" and "never reported to work while impaired by illegal drugs." The ESC concluded as a matter of law, however, that petitioner's drug conviction was misconduct within the meaning of N.C.G.S. § 96-14(2), disqualifying him from drawing unemployment benefits. On petitioner's appeal, the trial court upheld the ESC's decision. We affirm.
>
> . . . .
>
> By enacting the new provision in N.C.G.S. § 96-14(2), the legislature was manifestly addressing the serious drug problem in the work force. Sound reasons exist for legislating that conduct related to substance abuse is misconduct giving rise to discharge. A drug-dealing employee may so conduct himself that (i) fellow employees are tempted to engage in the use of drugs; (ii) use of drugs may affect work performance and quality; and (iii) the employer's good will and business interests could thereby be threatened. *An employer is not, however, required to prove actual harm to its interests in order to meet its burden of showing employee misconduct. In re Gregory v. N.C. Dept. of Revenue,* 93 N.C. App. 785, 379 S.E.2d 51 (1989).

*Lynch,* 105 N.C. App. at 223-26, 412 S.E.2d at 164-65 (emphasis added).

Here, petitioners' conduct clearly violated respondent-ESC's Policy for an Alcohol and Drug Free Workplace, *supra,* and constituted personal conduct under respondent-ESC's Corrective Action Policy and under the State Personnel Manual. The dismissal of petitioners was an option for respondent-ESC under these policies. Like G.S. 96-14(2), these policies and G.S. 126-35(a) speak only of conduct and do not mention the necessity of demonstrated negative consequences upon the agency. *In re Gregory,* 93 N.C. App. at 786, 379 S.E.2d at 52.

Given these policies and the general principles found in *Lynch* and *In Re Gregory*, we hold that where an employee has engaged in off-duty criminal conduct, the agency need not show actual harm to its interests to demonstrate just cause for an employee's dismissal. However, it is well established that administrative agencies may not engage in arbitrary and capricious conduct. *Lewis*, 92 N.C. App. at 740, 375 S.E.2d at 714; *Com'r of Ins. v. Rate Bureau*, 300 N.C. 381, 420, 269 S.E.2d 547, 573, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 300 (1980); G.S. 150B-51(b)(6). Accordingly, we hold that in cases in which an employee has been dismissed based upon an act of off-duty criminal conduct, the agency must demonstrate that the dismissal is supported by the existence of a *rational nexus* between the type of criminal conduct committed and the potential adverse impact on the employee's future ability to perform for the agency. *Accord, Rogliano v. Fayetteville County Board of Education*, 176 W.Va. 700, 347 S.E.2d 220 (1986); *Chicago Board of Education v. Payne*, 102 Ill.App.3d 741, 430 N.E.2d 310 (1981); *Board of Trustees of Santa Maria Joint Union High School Dist. v. Judge*, 50 Cal.App.3d 920, 123 Cal.Rptr. 830 (1975). In determining whether a rational nexus exists, the Commission may consider the following factors:

—the degree to which, if any, the conduct may have adversely affected clients or colleagues;

—the relationship between the type of work performed by the employee for the agency and the type of criminal conduct committed;

—the likelihood of recurrence of the questioned conduct and the degree to which the conduct may affect work performance, work quality, and the agency's good will and interests;

—the proximity or remoteness in time of the conduct to the commencement of the disciplinary proceedings;

—the extenuating or aggravating circumstances, if any, surrounding the conduct;

—the blameworthiness or praiseworthiness of the motives resulting in the conduct; and

—the presence or absence of any relevant factors in mitigation.

Although we now recommend certain factors which could be considered by the Commission in employing the rational nexus test, we caution that no list of factors should be viewed as all-inclusive.

Given the disposition of this appeal reversing the Superior Court's conclusions regarding the scope of the admissions and the sufficiency of the offer of proof, we remand the cause to the Superior Court for remand to the Personnel Commission. The Personnel Commission shall conduct, or cause to be conducted, a further hearing and shall make appropriate findings of fact and conclusions of law regarding the agency's demonstration or failure to demonstrate a rational nexus. *See N.C. Dept. of Correction v. Gibson,* 308 N.C. 131, 148, 301 S.E.2d 78, 88 (1983). *See also Franklin Road Properties v. City of Raleigh,* 94 N.C. App. 731, 737, 381 S.E.2d 487, 491 (1989).

In the interest of clarity, we particularly note that we are aware of the provisions of G.S. 150B-51(a):

Initial Determination in Certain Cases.—In reviewing a final decision in a contested case in which an administrative law judge made a recommended decision, the court shall make two initial determinations. First, the court shall determine whether the agency heard new evidence after receiving the recommended decision. *If the court determines that the agency heard new evidence, the court shall reverse the decision or remand the case to the agency to enter a decision in accordance with the evidence in the official record.*

(Emphasis added.) However, given the circumstances here in which respondent-ESC was precluded by the administrative law judge from introducing, or even including in the record of proceedings, critical testimony, upon remand the Personnel Commission shall have the authority to supplement the official record by conducting, or causing to be conducted, a hearing to receive further evidence as necessitated to resolve the foregoing issues addressed by this appeal. *See Employment Security Commission v. Lachman,* 305 N.C. 492, 507, 290 S.E.2d 616, 627 (1982). *See also Harris v. N.C. Farm Bureau Mutual Ins. Co.,* 91 N.C. App. 147, 370 S.E.2d 700 (1988).

## V. *Conclusion*

In light of the incomplete state of the record here, we may not properly consider, and accordingly decline to consider, respondent-ESC's remaining assignments of error, including whether there was substantial evidence to support the Personnel Commission's conclusions of law and its resulting order of dismissal. *See N.C. Dept. of Correction,* 308 N.C. at 147, 301 S.E.2d at 88.

ELLIOT v. N.C. DEPT. OF HUMAN RESOURCES

[115 N.C. App. 613 (1994)]

In summary, we hold that the Superior Court erred by not remanding the matter to the Personnel Commission pursuant to G.S. 150B-51 for a hearing as to whether respondent-ESC had demonstrated a rational nexus to justify the dismissal of petitioners based upon their off-duty criminal conduct. For the reasons stated, the 29 June 1993 order of the Superior Court is reversed and this cause is remanded to the Superior Court for remand to the Personnel Commission for additional proceedings consistent with this opinion.

Reversed and remanded.

Judges LEWIS and WYNN concur.